And Mr. Jensen, I see you were appointed by the court. I wanted to thank you for your service. Our fifth case is Barbera v. Pearson Education. And Ms. Delaney for the appellant. May it please the court, Kathleen Delaney. I represent Vicki Barbera, who was for 27 years an excellent employee of Pearson. In 2013, Pearson began to exit from its textbook print business, which by February of 2016 would affect almost 900 employees. For one month in 2013, Pearson offered a voluntary severance program to incentivize departures. For two weeks in 2014, another VSP was offered. The second VSP was supposed to be the last chance for employees to voluntarily exit with severance pay before Pearson shuttered this business unit. But after the 2014 VSP closed, and after Pearson issued a request for proposal to Donley to outsource its print business, only four employees asked to leave with severance. Those three men and one woman were all ineligible for severance at that time because they were voluntarily resigning. The company paid the three men, but didn't pay the one woman. This court should allow a jury to decide whether Pearson discriminated against Ms. Barbera by denying her the same so-called special treatment that the company willingly gave her three male comparators the very first time that they asked. Counsel, can you talk about how the district court said that they weren't valid comparators because they sought the severance pay before the Donley transaction and that your client was much later in the game? Well, all three men asked after the request for proposal had already gone out to Donley, point one. Point two, the district court erroneously weighed that comparator evidence to find, as a matter of law, that her comparator group were the 700 people who asked earlier to leave voluntarily and get severance. Under Coleman versus Donahoe, whether a comparator is similarly situated is usually a question for the jury to decide. And the only issue on summary judgment was whether we could provide enough evidence that a jury could reasonably find that the four, the group of four, were similarly situated. And we believe we did that through the affidavits of the three male comparators who voluntarily stepped up and helped their former colleague establish that she was treated differently by their former employer. Isn't it a fact that the people who left along with your client, none of them got severance? Nobody else asked, Your Honor. Ms. Barbera is that in the record? That is in the record. That's in the Debbie Freeman human resources affidavit. And it's also in the defendant appellee's brief. That's undisputed. There are only four people who asked to leave voluntarily and get severance pay after the second voluntary program had closed. Three men, one woman. Is it also true that your client was the only one who did not accept employment at RR Donahoe? I believe that the defendant alleged that in their papers. I don't, I didn't have a way to independently verify that. So each of these four individuals asked to voluntarily leave after Pearson had started the migration from print to digital in 2013, after the 2013 voluntary program had closed, after the 2014 voluntary program had closed, and after the outsourcing request for proposal had been issued to RR Donley. So we believe that a jury could reasonably find that the three men who got special treatment weren't any different from the one woman who was denied that same special treatment. Additionally, the district court improperly held our client to a burden of proving by a preponderance of the evidence standard on a summary judgment motion. That's on page 22 of the district court's order. And that application of the clearly wrong legal standard alone constitutes reversible error that should allow us a remand for a jury to decide this case. If an employer takes an action against one employee in a protected class, but not another outside of the class, and all other things are equal between them, the court can infer discrimination, at least provisionarily, at the prima facie stage of the analysis. And we see this case as similar to the Humphreys case, which involved managers at Cracker Barrel restaurants in race discrimination. A African-American manager had left a safe unlocked at nighttime and got fired for it. A Caucasian manager left a safe unlocked during the daytime and didn't get fired for it. And this court in that case found that that difference of only a half a day, 12 hours in the day was not enough to differentiate between those two people. They were both similarly situated. Here, we have a difference of a few months between when Ms. Barbera's male comparators asked for severance and when she asked for severance. And that few months is looked at in the context of a three-year process during which this company was shedding its employees in the print business. So we believe that's enough for us to get to a jury on these facts. All four of these people were ineligible under the language of the plan at the time that they asked for severance. How many people left during the actual VSP period? The two VSPs resulted in 180 people leaving. 180? 180. So from February of 2013 to February of 2016, there were a total of almost 900 jobs lost, the 180 who went voluntarily, and then the 700 who were gone when Pearson handed the keys over to Donnelly. And she considered it and decided not to during that time period, right? Well, her department wasn't eligible for the first VSP. And then there was an issue about whether her department was included in the second VSP. And she testified that at no time did anyone say to her, you have a chance to go, or if you want an informal VSP, we'll help you leave. Instead, she testified that she asked three different people three different times months before the Donnelly transaction was announced to the employees at large. And each time, she was given the runaround, told to go talk to someone else, told to ask someone else, but not told, yes, you can do what these three men did. And then when she finally sent an email asking for this same treatment, the answer she got back from her boss was, you should have asked under the 2014 VSP. You're too late. But all three of those men asked after the 2014 VSP closed, and it wasn't too late for them. But it was also before, at least the way I think I saw this, before that there was actually a commitment to Donnelly. Before the contract was signed, that's true. But again, and the defendant's brief says this was a slow evolution away from print and to digital. This was completely foreseeable. And in fact, two of the three men were still getting their incremental severance payments within days and weeks of the public announcement of the outsourcing deal. I'd like to reserve the rest of my time, please. Thank you. Thank you, counsel. Ms. Wilson. Good morning, Your Honors. May it please the court. Jane Doll Wilson, counsel for the appellees. Your Honors, Ms. Barbera, the plaintiff in this matter, had opportunity to end her employment with Pearson with severance, but declined to do so because she wasn't financially ready. She wanted to exit the company on her terms at the time it was optimal for her, which is understandable. But when she finally decided that she was ready to go, the opportunity for her to leave with severance was no longer available because Pearson was no longer looking for budget cuts. It had made the decision to transfer its business, to outsource its business to RR Donnelly by mid-2015. And that point in time is critical with respect to the comparators that Ms. Barbera points to. Some context is helpful here. In 2013 through early 2015, Pearson was dealing with a very struggling aspect of its business. It's an educational services company. Its core business for many, many years, of course, had been textbooks. But people simply aren't buying textbooks as much as they used to. And Pearson was in the midst of transitioning its business model to a digital media. As part of that, they were looking for various cost cutting measures. It included everything from voluntary severance programs to asking employees if they were interested in leaving with severance, to terminating some employees, to issuing an RFP for outsourcing the business. But by mid-2015, Pearson was no longer looking for budget cuts within its own business because it had made the decision to transfer and outsource to RR Donnelly. By her own testimony, Ms. Barbera admitted that she did not start asking about leaving Pearson with severance until late 2015. And her formal request was actually not made until January 12, on or around January 12, 2016. While Ms. Barbera's counsel has spent a lot of time talking about comparators, she has not identified a single male employee who requested severance around the time that she did. And that is really fatal to her claim. The reason that she's not identified any true comparator is because there is none. The record evidence is that no other Pearson employee who was similarly affected by the RR Donnelly transaction requested and received severance. Rather, all other affected employees, approximately 700 people, except Ms. Barbera, accepted their new employment with RR Donnelly. Ms. Barbera has spent some time muddying the waters, particularly in the reply brief, suggesting that a jury could conclude that she asked around the same time as the men. But I just want to clarify that the record is absolutely clear. Her own deposition testimony is that she did not ask in April 2015, when one of the men left. She did not ask in June 2015, when one of her other comparators left. Rather, she didn't ask about severance until, according to her own testimony, sometime late in 2015. By the time she had started asking about leaving with severance, the world had changed at Pearson. The company, which had been in the midst of these major cost-cutting initiatives, was no longer looking to do that. Rather, it was in the process of actually transitioning its workforce to RR Donnelly so that the outsourcing transaction could be successful. When you say outsourcing, is this a method of sale? Did they sell the business, or did they retain an interest in it after it was transferred to RR Donnelly? Your Honor, the assets- I don't know what outsourcing means, in other words. Right. My understanding is that the assets essentially related to the print business transfer to RR Donnelly. RR Donnelly took over the print and supply end of the business. So was it an asset purchase? I think it would be characterized as a sale of a portion of the business, yes. As you can imagine, at the time of an outsourcing, many employees may not wish to transfer to a new employer. Many people might prefer to leave with severance. But the policy, Pearson's severance policy, reasonably precludes that so that the deal can be successful. Simply put, Pearson and RR Donnelly needed the 700 employees that were working in the warehouses and working on the print side of the business to continue to carry out the work that RR Donnelly was now taking over. Pearson went this route. Instead of closing different sites, the work at those facilities was continuing. Critically, none of this has anything to do with sex discrimination. The record evidence is that Ms. Barbera was a longstanding and, frankly, highly valued employee. There's absolutely no evidence on this record of any kind of animus on the basis of sex. With respect to the district court's legal analysis, she found that there were two critical variables as to why the comparators that Ms. Barbera identified were not, in fact, comparable. One, of course, being the timing of their requests. And one of the cases cited by Ms. Barbera in her briefs, Houston versus Easton Area School District, is a severance case. And it does specifically identify timing and the policies that are in place at the time as key variables to look at with respect to who is comparable and who is not. Ms. Barbera testified unequivocally that she did not seek severance at the time that the men that she asked to be compared to sought severance. And she also testified that she's not aware of any employee to whom Pearson offered severance after September 2015, when she became aware of the transaction. And there is, in fact, no one who requested and received severance at that time. Pearson's severance policy, which specifically includes the mergers and acquisitions clause that references severance not being available to any employee if there is a transaction with another company where the employee will then be offered re-employment, is another independent reason as to why the comparators that Ms. Barbera points to are not, in fact, comparable, because their jobs were not subject to being rebadged. And the policy that applied to Ms. Barbera did not apply to them at the time that they negotiated their own exit with the company with severance. Well, R.R. Donnelly took over. I think it was 700, at least including her. And it was the last day that she then didn't show up. So that was, I guess one could say they were counting on her, because they talked to her about being talented in certain areas. R.R. Donnelly is assuming transfer, whatever you're calling it, that it's a turnkey diminished operation, at least the way I understand it. Correct, Your Honor. So that package of people that went with the transition was an operational business, and she was part of it. Correct, Your Honor. So there was a certain reason for certain deadlines where you put that package together, and she was included in it. Maybe one reason why her late request was not timely, because they'd already talked about transferring everything else. That doesn't mean she was forced to go. I guess she didn't. She quit. But at least I make that at least some distinction as far as the other people that got the VSP earlier. Certainly, Your Honor. And just to build on that, at the time that Ms. Barbera made her request for severance, the company was in the process of migrating its workforce. It wasn't looking for budget cuts. It was attempting to deliver its workforce, if you will, so that the business could continue. And just briefly, if I could touch on the issue of pretext, the court doesn't need to reach that issue, because Ms. Barbera has not provided evidence of valid comparators. But if it does, there's no phony or inconsistent reason in this record. It was true, as she was told by Mr. Nathanson, according to her testimony, that she was too late for the 2014 VSP. It was also true, as she was told by senior counsel for Pearson, when her counsel reached out and made a request for severance, that she was ineligible under the policy. And at the end of the day, Your Honors, there's no evidence of sex discrimination in the case. Thank you, counsel. Ms. Delaney, you have a few minutes for rebuttal. Thank you. The three men were not eligible under the VSP. The VSP had closed before they asked. That's undisputed. Ms. Barbera testified that she asked later in 2015, not late 2015. And those citations are on page 9 of our brief. It was in the fall that she started asking three people and kept getting told, no, talk to this person, talk to that person. She was forced to make a formal request, which came January 12. The men were never forced to make a formal request. They never had to ask more than one time. And they left when they were ready to go, because they each already had a job to go to. So they had the opportunity to do a job search, find a new job, then ask, hey, can I get severance and go voluntarily? And they were all told, yes, you may. Yes, you may. Yes, you may. When she tries to do the same thing within a few months, she's told, no, you may not. And there is no evidence that she was a key employee or that her not showing up would have anything to do with the transaction closing. Employees were not told about the outsourcing until January 16. She had already asked three or four times before that date. What was the space in time between the last man that left on whatever date and the date that she attempted to? The last man left in June of 2015. And what was her first date? We don't have a specific date, because the company deleted her entire email, including her calendar. What did she say? That was the request. I'm sorry, I just want to clarify this one point. The June 2015 is when he left or when he requested? Is when Mr. Lukasik left. So when did he request? He requested in April or March or April. There were two men in March and April of 2015. The last one to go was in June. But the relevant point is the request, not the departure date. So when was the last request? April, you said? I think it was April. But it might not have been the guy who was the last to leave. I think that part of it. That was Ramsey? I believe that's correct. Yes. So from 2013 to 2016, Pearson was gradually shedding 900 people. Only four of those people asked to resign and get severance outside of the deadlines for voluntary incentive plans. Three men got a yes. One woman got a no. And when she talked to the HR director about the two she knew of, Ms. Freeman says, oh, there's a third. But don't tell them I told you. We have contradictory reasons for Mr. Nathanson and Mr. Lennon. That's all we need for pretext. This is a classic gender discrimination case. And the idea that they have to all leave on the same day to be treated the same, that's not the way the comparator analysis works. A jury could just as easily say the relevant period is the three years that 900 people were lost. Thank you, Counselor. You're over time. Case is taken under advisement. Our last.